Louis Rothbard and Lottie Rothbard v. Commissioner.
Rothbard v. Commissioner
Docket No. 60530.
United States Tax Court
T.C. Memo 1957-155; 1957 Tax Ct. Memo LEXIS 111; 16 T.C.M. (CCH) 636; T.C.M. (RIA) 57155; July 31, 1957
*111 Arthur L. Harrow, Esq., 19 Rector Street, New York, N. Y., for the petitioners. Herbert Rothenberg, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined a deficiency in income tax for the year 1952 of $620, and an addition to tax of $37.20 pursuant to section 294(d)(2), Internal Revenue Code of 1939. The only question for decision is whether a nonbusiness bad debt deduction was properly claimed in 1952. Findings of Fact Some of the facts are stipulated and the stipulation is included herein by reference. The petitioners are husband and wife, residing in New York, New York. Their joint return for the taxable year 1952 involved herein was filed with the collector of internal revenue for the first district of New York. The word "petitioner" will be hereinafter used to refer to Louis Rothbard. Lottie Rothbard is involved only because a joint individual tax return was filed by her and her husband. The petitioner on his individual income tax return for the calendar year 1952 reported in Schedule D, Form 1040, loans to Diameter, Inc. in excess of $4,000, claiming a capital loss in that amount and *112 accordingly a deduction of $1,000 in that year. Lorraine is petitioner's only child and she has at all times been claimed by petitioner as a dependent for income tax purposes. She graduated from Russell Sage College in 1943 and is presently a full-time student working for her Master's degree. Her schooling is being paid for by petitioner and she is still presently claimed as a dependent by her father. In May 1947 Lorraine and Sally Woroner, a college friend of Lorraine's, formed Facet Magazine, Inc., a corporation organized under the laws of the State of New York, for the purpose of publishing a monthly magazine devoted to literature, fine arts and music. In November 1950 the corporate name was changed to Diameter, Inc. The original capital of the corporation was $2,000, which was subscribed to by Lorraine and Sally, each of whom held title to 50 per cent of the stock. The $1,000 contributed to capital by Lorraine consisted of a check dated May 17, 1947, signed by petitioner in favor of Lorraine. The two stockholders were the sole corporate officers, Sally serving as president and secretary of the corporation, and Lorraine serving as vice president and treasurer. From time *113 to time from 1950 until March 1953 petitioner made advances to his daughter for the use of the corporation and paid certain expenses of the corporation. During the examination of petitioner's 1952 tax return by a revenue agent petitioner's certified public accountant and representative produced the following list of alleged loans to Diameter, Inc. in substantiation of the $4,000 figure referred to above: May 1947
$1,000.00
December 29, 1950
1,000.00
May 24, 1951
285.91
June 22, 1951
400.00
June 27, 1951
300.00
July 25, 1951
300.00
December 8, 1952
525.00
March 1953
500.00
Total
$4,310.91
The cash receipts book of the corporation shows the following amounts entered as "loans" from petitioner. March 2, 1950
$ 67.13
December 29, 1950
1,000.00
May 24, 1951
285.91
June 22, 1951
400.00
June 27, 1951
300.00
July 25, 1951
300.00
March 8, 1953
500.00
Total
$2,853.04
The corporate general ledger, under the title "Loans and Exchanges" shows all the above amounts, except for the March 8, 1953 entry in the amount of $500. According to this ledger none of the above-listed amounts was ever repaid by the corporation to petitioner. *114 The March 2, 1950 item in the amount of $67.13 was erroneously entered on the cash receipts book as a loan. The moneys were advanced without security, without any notes or other written indicia of indebtedness, and without a due date designated for repayment. These sums were not to be repaid unless the corporation had sufficient income with which to pay back the advances. Petitioner gave the two girls the use of a room in his law office suite from which they conducted the magazine's business activities. Petitioner did not charge the corporation any rent for this office space. They occupied these quarters for several years. Petitioner then needed the additional space for his legal practice. Accordingly, the corporation's supplies were placed in storage. Since the corporation was unable to afford the expense of renting an office, no office space was ever obtained after vacating the quarters donated by petitioner. Lorraine worked on the project on a full-time basis. Neither Lorraine nor Sally ever received any salary or income from the corporation, nor did they employ any salaried employees. From 1944 to the formation of the corporation in the spring of 1947 Sally had been *115 employed as a teacher in the New York City School System. She did not intend at that time to resume teaching. It was anticipated by the two girls that the first issue of the magazine would be published within the first year 1947-1948. However, they were unable to have the first issue published within this period. Sally resumed teaching in the fall of 1948. From that time on she held a full-time teaching position and devoted whatever spare time she had to the project. After failing to meet the 1948 publication goal, it was planned to have the initial issue of the magazine published prior to Christmas 1950. However, due to printing difficulties, the first issue was again delayed. The initial issue was published in March 1951. A second issue was published in April 1951. No further issues were ever published. Following the publication of the second issue in April 1951, a third issue was prepared. It had been decided not to ask petitioner for any additional funds. Publication was to be delayed until sufficient income could be obtained from advertisements and subscriptions to cover the printing costs of this issue. These funds were never obtained. The magazine was to be financed solely *116 by advertisements and subscriptions. All advertisements were to be prepared under the direction of the two girls and were required to meet the artistic standards desired by them for the magazine. Lorraine personally visited publishers, recording companies, musical instrument stores, art supply stores, art supply manufacturers, concert halls, textile designers, etc. in an effort to solicit advertisements for the project. However, the corporation succeeded in obtaining only one advertisement for the two published issues. One or two contracts for advertisement were also secured for the third issue. The total income derived from advertisements for the two published issues was $115.65. None of the artists who contributed work to the magazine was ever paid any fee for his contribution. Nor do the corporate books reflect the making of any refunds, after the magazine ceased publication, to the various subscribers to the magazine listed therein. The cost of an annual subscription to the magazine was $4. According to the books of the corporation the number of annual subscribers obtained by the monthly magazine is as follows: Calendar
Number of Annual
Year
Subscribers
1948
53
1949
113
1950
1
1951
83
1952
54
Total
304
*117 Included in the list of subscribers were approximately 18 universities and colleges. Sales from all other sources for the period 1948 through 1952 totalled approximately $122.20. Prior to publication in March 1951 the bulk of the subscribers were personal friends and acquaintances of Sally or of the Rothbard family. The estimated cost of printing the magazine was $1,200 per issue, or $14,400 on an annual subscription basis. The balance sheets of the corporation on April 30 of the indicated years were as follows: 1948
1949
1950
1951
1952
Assets
Cash
$1,451.05
$1,024.34
$1,389.14
$ 15.38
$ 196.42
Furniture & Fixtures
31.59
28.08
24.57
21.06
17.55
Other Assets
31.14
294.30
149.72
75.00
75.00
Total Assets
$1,513.78
$1,346.72
$1,563.43
$ 111.44
$ 288.97
Liabilities
Loans & Exchanges
$1,835.36
$3,136.38
Capital Stock
$2,000.00
$2,000.00
$2,000.00
2,000.00
2,000.00
Surplus or (Deficit)
( 486.22)
( 653.28)
( 436.57)
(3,723.92)
(4,847.41)
Total Liabilities
$1,513.78
$1,346.72
$1,563.43
$ 111.44
$ 288.97
Petitioner was at all times kept informed by the two girls of the general financial condition of *118 the project. Ultimate Finding and Conclusion The moneys advanced to the corporation by the petitioner did not constitute a debt of the corporation to petitioner in 1952. Opinion The issue is one of fact and our ultimate finding and conclusion is dispositive of it. Though petitioner and the two girls testified that it was intended to create a debtorcreditor relationship between petitioner and the corporation for the amount of the advances made by petitioner, we are convinced by the whole record that no such intention existed. Commencing in 1950 and thereafter until 1953, petitioner advanced moneys for the magazine project as requested by his daughter. No notes or other evidence of indebtedness was given. No interest was charged. No due date was specified. If the money was to be repaid at all it appears from the record that this would depend on whether the project ever produced enough income to repay the advances. Though the petitioner testified he kept in touch with the situation from a financial standpoint this is to some extent belied by the fact that on his 1952 return he stated a claimed capital loss of more than $4,000, whereas, the corporate books showed advances only *119 of some $2,850, and in this proceeding petitioner limits his claim to the amount of $2,375.92 because of alleged repayment. It is evident that petitioner's attention to the affairs of the magazine was cursory at best. We think, rather than intending the establishment of a bona fide debtor-creditor relationship, petitioner here was simply making advances to his daughter's magazine project out of a commendable paternal interest in furthering her literary pursuits. The evidence falls short of proving that a debt existed and the Commissioner's determination (which he explained by stating "The debt is not allowable due to your failure to establish the validity thereof") must be sustained. Decision will be entered for the respondent.